IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| SUSAN VEVERKA,<br><br>    Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | CASE NO. 5:25-CV-00633-DAC<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**MEMORANDUM OPINION & ORDER** |

### INTRODUCTION

Plaintiff Susan Veverka challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry dated Apr. 1, 2025). The parties then consented to my exercising jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF #8). For the reasons below, I **AFFIRM** the Commissioner's decision.

### PROCEDURAL BACKGROUND

Ms. Veverka applied for DIB in October 2022, alleging she became disabled on February 5, 2021, due to a concussion. (Tr. 147, 181). After the claim was denied initially and on reconsideration, Ms. Veverka requested a hearing before an Administrative Law Judge. (Tr. 59, 67, 89). On December 14, 2023, Ms. Veverka (represented by counsel) and a vocational expert (VE) testified before an ALJ. (Tr. 38-58). On February 7, 2024, the ALJ determined Ms. Veverka was not disabled. (Tr. 11-37). On February 20, 2025, the Appeals Council denied Ms. Veverka's

1

request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. § 404.981). Ms. Veverka timely filed this action on April 1, 2025. (ECF #1).

### FACTUAL BACKGROUND

**I.     Personal and Vocational Evidence**

Ms. Veverka was 57 years old on her alleged onset date and 59 years old at the hearing. (*See* Tr. 60). She has a master's degree in education and past work experience as a secondary school mathematics teacher. (Tr. 44).

**II.    Relevant Medical Evidence**

**2021.** In January, Ms. Veverka met with her endocrinologist James Salem, M.D., for a follow-up appointment to evaluate her established conditions of hyperthyroidism, goiter, and a thyroid nodule. (Tr. 318-19). Ms. Veverka described decreased concentration, finding it harder to remember things, and feeling "tired but getting through the day." (Tr. 319). Dr. Salem increased the frequency of her methimazole[1] dose and instructed her to return in six months. (*Id.*).

On February 5, Ms. Veverka slipped and fell on ice, striking the back of her head. (*See* Tr. 266). She does not think she lost consciousness. (*Id.*). EMS personnel examined her and advised her to "take it easy." (*Id.*). Four days later, Ms. Veverka met with Anne Grantham, M.D., and complained of feeling tired, foggy, and nauseous since the fall. (*Id.*). She described vertigo with movement, especially with moving her head, and soreness at the back of her head, neck, and upper back. (*Id.*). Dr. Grantham noted Ms. Veverka was well-appearing and alert but looked fatigued.

---

[1] Methimazole is used to treat hyperthyroidism – when the thyroid gland produces excessive thyroid hormone. Possible side effects include upset stomach, drowsiness, and dizziness. *See Methimazole*, *MedlinePlus* http://medlineplus.gov/druginfo/meds/a682464.html (last accessed Dec. 12, 2025).

2

(*Id.*). She had occipital tenderness and endorsed mild vertigo with rightward gaze. (*Id.*). Dr. Grantham diagnosed a concussion, recommended Tylenol and ibuprofen, and ordered Ms. Veverka to rest, drink fluids, and avoid screens. (*Id.*).

In June, Ms. Veverka returned to Dr. Grantham's office for her annual exam and reported that physical therapy helps her dizziness, but she has low endurance and difficulty with concentration. (Tr. 264).

In July, Dr. Salem reviewed laboratory results and directed Ms. Veverka to stop taking methimazole because her thyroid was not making enough hormone. (Tr. 314). During their appointment later that month, Ms. Veverka reported that she sustained a concussion in February and endorsed fatigue and difficulty with concentration, specifically multitasking. (Tr. 312-13). Dr. Salem ordered lab work to check cortisol and other hormone levels and directed her to stay off methimazole. (Tr. 312). After the lab work showed "borderline" cortisol levels, Dr. Salem opted to re-evaluate her for any changes at her next appointment. (Tr. 310).

**2022.** In January, Ms. Veverka had COVID-19 so her appointment with Dr. Salem was via telehealth. (Tr. 305-06). After reviewing her lab results, Dr. Salem instructed her to restart methimazole. (Tr. 306).

In February, Ms. Veverka reported ongoing post-concussive symptoms, including difficulty concentrating. (Tr. 261). As an example, it took her hours to book a plane reservation online because she kept losing her place and getting frustrated. (*Id.*). She endorsed improvement with physical therapy but did not feel back to normal. (*Id.*). Dr. Grantham recommended Ms. Veverka continue physical therapy and referred her to a neurologist for evaluation. (*Id.*).

During a March neurological consultation with James R. Bavis, M.D., Ms. Veverka reported dizziness, fatigue, and memory issues. (Tr. 428). She endorsed confusion and disorientation, imbalance and issues with coordination, abnormal vision, headaches, dizziness, sensitivity to noise, neck pain, tingling, problems with focus and memory, and feeling abnormally tired. (*Id.*). In terms of concentration, she reported difficulty with finding familiar words, making plans, and maintaining attention. (Tr. 431). On neurological examination, Ms. Veverka was alert and oriented and showed normal concentration. (Tr. 434). Dr. Bavis noted Ms. Veverka could "only converge her eyes to 8 [inches] from her nose." (Tr. 435). He diagnosed a cognitive deficit stemming from her brain injury, vertigo, binocular vision disorder with convergence insufficiency, and ataxia after head trauma. (Tr. 436). Dr. Bavis ordered an MRI of her brain and vestibular-function testing and referred her for a neuro-optometry consultation to evaluate and treat her eye-movement issues. (Tr. 436-37).

In April, Dr. Salem directed Ms. Veverka to reduce the frequency of methimazole because her thyroid hormone was slightly low. (Tr. 293). When her thyroid level was still low in June, Dr. Salem told her to stop taking methimazole. (Tr. 291).

Ms. Veverka followed up with Dr. Bavis in June and reported that her new glasses were helping her vision, and her dizziness was better. (Tr. 418). She also endorsed continued memory and concentration issues, with slow improvement. (*Id.*). Her brain MRI was unremarkable. (Tr. 422). The vestibular-function study was abnormal and indicated right-peripheral-vestibular disease. (Tr. 423-24). On examination, Ms. Veverka displayed normal concentration and memory. (Tr. 420). Dr. Bavis determined Ms. Veverka needs "exertional therapy in order to get her brain

4

working back at the level it could before her head trauma" and referred her for physical therapy "to help her recover the cognitive functions that she loses when she is exerting herself." (Tr. 426).

In July, Ms. Veverka met with Brian Tapscott, Ph.D., for a neuropsychological evaluation. (Tr. 267). During the clinical interview, Ms. Veverka reported that after hitting her head, she had headaches, vertigo, balance problems, vision issues, fatigue, memory problems, attention problems, and word-finding problems. (*Id.*). After physical, speech, and vestibular therapy, Ms. Veverka's vertigo, balance problems, and vision issues resolved. (*Id.*). Her headaches and cognitive issues persisted despite some improvement, and she has significant fatigue. (*Id.*). Ms. Veverka took one break during testing and was "somewhat critical of her test performance" but tried all tasks and persisted on challenging tasks. (Tr. 269). On tests assessing general intellect, attention and information processing, fundamental language, visuospatial and constructional processing, and executive function, Ms. Veverka scored "in the high average range" or "within normal expectations." (*Id.*). Learning and memory tests were notable for "relatively weak immediate recall/recognition on a test of verbal memory and a test of visual memory," but otherwise normal. (*Id.*).

> Dr. Tapscott summarized his findings and clinical impressions:
>
> The test results were notable for some mild learning inefficiency on memory testing, but her overall performance in this domain was not frankly impaired. She performed normally on all other tests administered. It is not abnormal to have some low scores across a large battery of neuropsychological tests. She can be reassured that, in general, this is a normal neuropsychological study with no evidence of significant cognitive impairment. That is not to minimize her concerns, but the test data are not consistent with a diagnosable cognitive disorder.
>
> Although some contribution from her concussion cannot be entirely ruled out, I suspect her day-to-day experience of cognitive problems is more likely due to difficulties with adjustment following the fall as well as fatigue, headaches, and stress. Her history of thyroid issues is also a consideration. Moreover, per available records

she first mentioned memory difficulties to her endocrinologist in 2018 and it is possible that pre-existing memory concerns have been attributed to the concussion. (Tr. 269-70). Dr. Tapscott recommended Ms. Veverka follow up with her neurologist, continue exertion therapy, gradually return to usual activities as tolerated, and consider psychotherapy for adjustment difficulties. (Tr. 270).

In October, Ms. Veverka met with Drusilla Grant, O.D., for an evaluation of her eyes. (Tr. 389). She reported her concussion history and endorsed difficulty with focusing, multitasking, and switching between paper and screen work. (*Id.*). On examination, Dr. Grant found reduced stereoacuity (depth perception). (*Id.*). She diagnosed fusion with defective stereopsis.[2] (*Id.*). Dr. Grant noted that Ms. Veverka's eye-teaming skills were good "but sustaining them throughout the day may be a challenge, as well as integration of vision, auditory, cognitive, and motor [inputs]." She recommended vision therapy if she still feels exhausted at the end of the day. (*Id.*).

In December, Ms. Veverka reported some cognitive improvement but did not feel back to her baseline condition. (Tr. 406). At the time, she was considering a part-time job. (*Id.*). Dr. Bavis determined that Ms. Veverka had post-concussion syndrome and consequently, "some depression as a result of the fatigue and other difficulties." (*Id.*). He prescribed venlafaxine[3] and referred her to physical therapy and psychotherapy. (Tr. 405-06).

---

[2] Fusion with defective stereopsis is a binocular-vision dysfunction where the brain can fuse the signals received from each eye into one image but cannot process the disparities of angle and distance, leading to difficulties with 3D vision and depth perception. The common symptoms are headaches, visual disruptions, balance issues, dizziness, vertigo, and reading effects like eye fatigue and re-reading. *See Binocular Vision Dysfunction, Cleveland Clinic Health Library,* http://my.clevelandclinic.org/health/diseases/binocular-vision-dysfunction-bvd (last accessed Dec. 12, 2025).

[3] Venlafaxine is used to treat depression and anxiety disorders. *See Venlafaxine, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a694020.html (last accessed Dec. 12, 2025).

**2023.** By February 2023, Ms. Veverka's dizziness was "much better" and she had fewer headaches each month. (Tr. 400). She still had issues with eye movement and she was more depressed and somnolent with venlafaxine. (*Id.*). Dr. Bavis referred her to an optometrist for evaluation, discontinued venlafaxine, and prescribed escitalopram.[4] (*Id.*).

In March, on Dr. Bavis's referral, Ms. Veverka met with a psychiatrist for evaluation. (Tr. 451). She endorsed symptoms of low mood and energy, irritability, excessive worry, and restlessness and described sleeping well (usually ten hours a night) but still feeling fatigued, significant difficulty with attention and concentration, and difficulty with organization. (Tr. 452). The doctor prescribed Wellbutrin with instructions for graduated dosing and encouraged her to start therapy.[5] (Tr. 455).

Ms. Veverka met with her psychiatrist again in April, describing some improvement in depression but also increased irritability and anxiety. (Tr. 457). She also endorsed continued difficulty with attention and concentration. (Tr. 458). Her psychiatrist reduced the dose of Wellbutrin and referred her for therapy. (Tr. 460). By May, Ms. Veverka stated she felt better with the lower dose of Wellbutrin and endorsed improved mood, motivation, and energy. (Tr. 462). She described some restlessness and irritability, and continued difficulty with attention and concentration. (Tr. 462). The psychiatrist prescribed hydroxyzine for breakthrough anxiety. (Tr. 464).

---

[4] Escitalopram is used to treat depression and generalized anxiety disorder. *See Escitalopram, MedlinePlus,* https//medlineplus.gov/druginfo/meds/a603005.html (last accessed Dec. 12, 2025).

[5] Wellbutrin is a brand name for bupropion, which is used to treat depression and seasonal affective disorder. *See Bupropion, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a695033.html (last accessed Dec. 12, 2025).

In May, Ms. Veverka reported the changes to her psychiatric medications left her "less depressed and anxious," aspirin alleviates her headaches, and she did not have any dizziness. (Tr. 479-80). She endorsed "easy fatiguability" of her eyes but had not scheduled an optometry appointment. (Tr. 480). Dr. Bavis noted Ms. Veverka was doing much better and recommended that she continue physical activity, be mindful to briefly rest when she has post-concussion symptoms and return to physical activity once recovered. (Tr. 484).

During a therapy session that month, Ms. Veverka described functioning well enough to manage herself and her home and care for her sister, but not well enough to return to work. (Tr. 490).

Ms. Veverka returned to her psychiatrist's office in July, where she reported doing better with therapy and that her symptoms of depression and anxiety were improved with medication. (Tr. 466-67). She continued to endorse fatigue, difficulty concentrating, difficulty with memory, and difficulty with attention while performing tasks. (Tr. 466). Even so, the mental status examination revealed appropriate memory and fair attention span and concentration. (Tr. 468).

**III.    Relevant Opinion Evidence**

In November 2022, Dr. Grant opined Ms. Veverka would have difficulty with integration and multitasking, such as listening, thinking, and writing at the same time. (Tr. 385). She determined Ms. Veverka would need a glare screen for her computer and the ability to work in an environment with fewer distractions, including noise, movement, and bright lights. (Tr. 388).

In January 2023, state agency medical consultant Leon Hughes, M.D., evaluated Ms. Veverka's medical records as part of the initial evaluation of her disability application. (Tr. 61-62). Dr. Hughes opined Ms. Veverka can lift and carry 20 pounds occasionally and 10 pounds

8

frequently; stand and walk for about 6 hours each and sit for 6 hours in an 8-hour workday; never climb ladders, ropes or scaffolds; and occasionally climb ramps and stairs. (Tr. 64-65). State agency psychological consultant Janet Souder, Psy.D., reviewed the same records, including a neuropsychological evaluation showing "generally normal cognitive abilities," and determined the records did not support any mental limitations. (Tr. 63).

In April 2023, state agency medical consultant Sarah Garon, M.D., reviewed updated medical records. (Tr. 69). Dr. Garon largely affirmed Dr. Hughes' findings but determined Ms. Veverka must also avoid exposure to unprotected heights and heavy machinery. (Tr. 72-73). State agency psychological consultant Erika Gilyot-Montgomery, Psy.D., affirmed Dr. Souder's findings. (Tr. 71).

**IV.     Relevant Testimonial Evidence**

At the hearing, counsel for Ms. Veverka claimed that her traumatic brain injury and resulting concussion led to conversion insufficiency, imbalance, dizziness, fatigue, decreased endurance, and issues with memory, concentration, and confusion. (Tr. 42). He argued Ms. Veverka's cognitive issues limit her to no more than unskilled work and repetitive tasks, restrictions that direct a finding of disabled under the regulations. (Tr. 43).

Ms. Veverka was a full-time high school math teacher from 2005 until her injury in 2021. (Tr. 46; *see also* Tr. 191). After her injury, she taught algebra on a part-time basis for the 2022-23 school year but then stopped teaching to focus on her health. (Tr. 45-46). She keeps a day planner to stay on track of her tasks, including medical appointments, household chores, and self-care. (Tr. 47-48). She is typically up early and tries to do a half-hour of yoga three days a week. (Tr. 48).

9

She usually makes it the whole day without lying back down but occasionally goes back to bed. (*Id.*). She fills her day with crafts, sewing, and reading. (Tr. 49).

Ms. Veverka can no longer work because she cannot function at a high level for a full day. (Tr. 47). She is fatigued and becomes weary as the day goes on such that she struggles to complete even two-step tasks. (*Id.*). For instance, she needs her son's help to apply for health insurance online. (*Id.*). Before the accident, Ms. Veverka never had problems teaching. (Tr. 50). When she returned to teaching part-time, Ms. Veverka needed extra time to help her students understand the material. (*See id.*) ("I would say I'll get back to you and I would work it out on paper and make sure it was right, and give it back to them."). She cannot return to full-time teaching because she no longer has the focus or the patience to handle 30 students. (Tr. 52-53).

The VE stated a person of Ms. Veverka's age, education, and experience could perform her past relevant work as a secondary school teacher if the person was subject to the limitations in the ALJ's residential functional capacity (RFC). (Tr. 54). But that person could not perform Ms. Veverka's past relevant work if limited to simple, routine tasks. (Tr. 54-55).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).

The ALJ follows a five-step evaluation process found at 20 C.F.R. § 404.1520 to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?
2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?
3. Does the severe impairment meet one of the listed impairments?
4. What is claimant's residual functional capacity and can claimant perform past relevant work?
5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the ALJ at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined that despite working after the alleged onset date, Ms. Veverka's work did not constitute "substantial gainful activity." (Tr. 16). At Step Two, the ALJ identified post-concussion syndrome and hyperthyroidism with multinodular goiter as severe impairments. (Tr. 17). At Step Three, the ALJ found Ms. Veverka's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 22). At Step Four, the ALJ determined Ms. Veverka has the RFC to perform light work and can lift and carry up to 20

pounds occasionally and 10 pounds frequently; sit, stand, and walk each for about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; and never work at unprotected heights or around moving mechanical parts. (Tr. 23). The ALJ then determined Ms. Veverka could perform her past relevant work as a secondary school teacher and concluded she was not disabled. (Tr. 31-32).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). However, the standard does not allow a selective reading of the record. "Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if

12

substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## DISCUSSION

Ms. Veverka asserts she cannot work primarily because she has significant fatigue that causes cognitive issues (such as difficulty with even two-step tasks or responding to student's questions) as the day goes on. (Tr. 47, 50). In other words, she struggles to function at the high level needed to teach high school math for a full school day. She argues the ALJ erred in analyzing

13

her statements concerning the intensity, persistence, and limiting effects of her fatigue and cognitive complaints and did not build an accurate and logical bridge between the evidence and her conclusions. (ECF #7 at PageID 534-35, 540).

A claimant's RFC represents the most a claimant can still do despite the physical and mental limitations resulting from the claimant's impairments. 20 C.F.R. § 404.1545(a). The ALJ alone determines a claimant's RFC. *Id.* § 404.1546(c). The RFC must be based on all relevant record evidence, including medical evidence, medical reports and opinions, the claimant's testimony, and statements the claimant made to medical providers. *Id.* § 404.1545(a); *see also Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010).

As part of the RFC assessment, the ALJ must evaluate the claimant's statements about asserted symptoms. Evaluating an individual's subjective symptoms is a two-step process. Social Security Ruling (SSR) 16-3p, 2017 WL 5180304, at *3 (Oct. 25, 2017). First, the ALJ must consider whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second step, the ALJ may consider evidence directly from the claimant or gleaned from other medical and non-medical sources. *Id.*

In evaluating the limiting effects of the claimant's symptoms, the ALJ must consider all evidence in the record including: daily activities; the location, duration, and frequency of the alleged symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of medication; treatment other than medication; other efforts made

14

to alleviate the symptoms; and other factors regarding the claimant's functional limitations. 20 C.F.R. § 404.1529(c)(3). The ALJ determines the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." SSR 16-3p, 2017 WL 5180304, at *2. An ALJ need not accept a claimant's subjective complaints, *Jones*, 336 F.3d at 476, and need not "make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F.App'x 496, 508 (6th Cir. 2006). In practice, this means the ALJ must make clear to the claimant and those reviewing the decision why the ALJ rejected probative evidence supporting a finding of disability. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (stating that ALJ's failure to explain more, aside from a conclusory analysis, denotes a lack of substantial evidence, even where the record may justify the ALJ's conclusion).

The regulations require the ALJ to evaluate a claimant's symptoms, and the explanation must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007); *see also* SSR 16-3p, 2017 WL 5180304, at *10. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-cv-1617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021). Absent compelling reason, a court may not disturb the ALJ's analysis of the claimant's subjective complaints or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-cv-98, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019).

In this case, the ALJ determined Ms. Veverka's alleged fatigue and cognitive difficulties were inconsistent with the medical evidence, her conservative and effective treatment, statements she made to her therapists in 2023 "that tend to show a considerably higher level of functioning, both physically and otherwise," and her testimony about her daily activities. (Tr. 28-29).

In terms of objective medical evidence, the ALJ emphasized Dr. Bavis's normal or mild findings on neurological examinations in March, June, and December 2022, and February and May 2023; Dr. Tapscott's report of a "normal neuropsychological study with no evidence of significant cognitive impairment"; and the psychiatrist's normal mental-status examination findings of intact memory and no word-finding difficulties. (Tr. 26-27). The ALJ also noted Ms. Veverka did not pursue further treatment for vision issues that purportedly caused fatigue, despite her complaints. (Tr. 27). Last, the ALJ determined Ms. Veverka's daily and other activities do not suggest that her fatigue is so severe as to keep her from working:

> Ms. Veverka testified that she had difficulty tutoring four students for 45-minute sessions in a school day over the 2022-2023 academic year, found that even this low part-time frequency of attempting to do what she had done on a full-time basis and for many years prior to February 2021 "took too much out of" her, and confirmed that she has not returned to such limited work for the current academic year.
>
> While carefully and thoughtfully considered, this degree of alleged difficulties encountered from post-concussion symptoms of cognitive difficulties and fatigue (primarily) is not consistent with the medical evidence discussed and analyzed above, or with her statements shown in the 2023 mental health treatment notes that tend to show a considerably higher level of functioning, both physically and otherwise.
>
> While starting at the end of the school year, the June 2023 through October 2023 reports from Dr. Chen and Ms. DeLeone variously note Ms. Veverka had shared about attending a basketball game, planning and then going on vacations that most notably include an international trip with family (to South America) with "great success," having "climbed a mountain" while there, obtaining a gym membership and regularly working out there, going on a three-mile walk, and then going on two closely successive vacations to other States (Colorado and New York) with her niece and grandnieces. All these significant activities occurred alongside her spending time

16

> with her own grandchildren, being dedicated to caring for her sister (who has a psychological diagnosis) and her sister's children and overall being "focused on meeting needs of others" but also getting joy out of same, and functioning well enough to do such activities while managing herself and her own home responsibilities.
>
> These reports made in 2023 to her mental health professionals are also met with her testimony that she remains able to drive, to do yoga for 30 minutes three times a week, to remember to feed her two cats and to fee[d] birds outside daily, to read and notably confirming here that she can retain written material in favored content (geography, history, and biographies), to participate in a book club, to sew as another enjoyable activity, and to engage in typical daily activities at home for preparing meals, making her bed, and cleaning. She testified that she does make it through a full day without needing to lie down most of the time, though imparting here that this is effortful on her part but also that she sets a time to get up and resume tasks if she does need to lie down, which is also not suggestive of any severe fatigability on physical activity.
>
> In sum, the claimant has described daily activities in her testimony and more so in several instances of 2023 medical treatment that are not limited to the extent of alleged intensity and persistence, despite treatment, of chronic fatigue, cognitive difficulties, or any other symptoms.

(Tr. 28-29) (cleaned up).

The ALJ properly applied the legal standards under SSR 16-3p and 20 C.F.R. § 404.1520 by evaluating Ms. Veverka's statements about her fatigue and issues with concentration and comparing those statements to the evidence of record, including the normal mental status examination findings, normal neuropsychological evaluation with no evidence of cognitive impairment, and Ms. Veverka's reported daily and other activities, and reasonably concluded her statements of disabling fatigue and impaired concentration are inconsistent with the record. Discounting reported symptoms to a certain degree is proper where the ALJ finds contradictions among the evidence and the claimant's reports. *Walters,* 127 F.3d at 531-32. And the ALJ substantially supported this conclusion with citations to the medical evidence and Ms. Veverka's statements to her treating providers.

Ms. Veverka takes issue with the ALJ's conclusion that her daily and other activities are inconsistent with the alleged severity of her symptoms but offers no compelling argument that the conclusion was not supported by substantial evidence. (ECF #7 at PageID 535). Planning and executing multiple trips in coordination with others, climbing mountains and hiking, retaining and comprehending written material, and participating in book clubs, among her other activities, could reasonably be considered inconsistent with the degree of fatigue and cognitive limitation Ms. Veverka reported. Otherwise, Ms. Veverka contends her reported symptoms are consistent with the entire record and support a limitation for unskilled work. (*Id.* at PageID 539-40). Importantly, while Ms. Veverka asserts the ALJ "ignored the substantial amount of evidence that supported her claims," she does not identify what evidence the ALJ allegedly ignored. (*Id.* at PageID 535). Nor does she argue the ALJ failed to consider any relevant factors. Rather, she disagrees with the outcome of the ALJ's analysis.

Judicial review of a social security appeal is limited to determining whether the ALJ applied the correct legal standards and whether the ALJ's factual conclusions are supported by substantial evidence. *Walters,* 127 F.3d at 528. The reviewing court does not reconsider facts, re-weigh the evidence, resolve conflicts in the evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *Bass v. McMahon,* 499 F.3d 506, 509 (6th Cir. 2007). Here, the ALJ summarized Ms. Veverka's subjective complaints about the intensity and persistence of her symptoms and determined they were inconsistent with the normal mental status examinations, the neuropsychological evaluation, her reported daily activities, and statements she made to her providers. (Tr. 28-29). In making this finding, the ALJ applied the correct legal standard and supported the decision with substantial evidence. And even if this court accepts that substantial

evidence also supports Ms. Veverka's position, remand would remain inappropriate. *See Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) ("The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion") (citation omitted).

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I **AFFIRM** the Commissioner's decision denying disability insurance benefits.

Dated: December 12, 2025

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE